No. 24-10533

---

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

---

THE UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

JUAN MARTINEZ,

Defendant-Appellant.

---

On Appeal from the United States District Court
for the Southern District of Georgia
Case No. 4:22-cr-0170
Hon. R. Stan Baker

---

# APPELLANT'S OPENING BRIEF

---

Caleb E. Mason, Esq., CA Bar No. 246653
Werksman Jackson & Quinn LLP
888 W. 6th St., Fourth Floor
Los Angeles, CA 90017
Tel: (213) 688-0460 / Fax: (213) 624-1942
E-mail: cmason@werksmanjackson.com

Attorney for Defendant-Appellant
JUAN MARTINEZ

# UNITD STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Appellee, | ) | |
| | ) | |
| vs. | ) | No. 24-10533 |
| | ) | |
| JUAN MARTINEZ, | ) | |
| | ) | |
| Appellant. | ) | |

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

As required by the 11th Cir. R. 26.1-1, Appellant Juan Martinez files his certificate of interested persons as follows:

Baker, Hon. R. Stan

Bonds, W. Dow

Dixon, Harry D., Jr.

Estes, David H.

General Dynamics (stock ticker: GD)

Gulfstream Aerospace Corporation (privately owned subsidiary of General Dynamics)

Hubbard, Darron J.

Martinez, Juan

Mason, Caleb E.

Ray, Hon. Christopher L.

Rhodes, Patricia Green

Solari, Jennifer Gayle

Sosa, Karen Margaret

Steinberg, Jill E.

Stuchell, James C.

Werksman, Mark J.

Werksman Jackson & Quinn, LLP

Dated: July 10, 2024     Respectfully submitted,


By:     /s/ Caleb E. Mason

        Caleb E. Mason

        Attorney for Defendant-Appellant
        JUAN MARTINEZ

# TABLE OF CONTENTS

Certificate of Interested Persons ............................................................ C-1

Table of Contents ...................................................................................... i

Table of Citations ................................................................................... iii

Statement Regarding Oral Argument .................................................... 1

Statement of Jurisdiction ........................................................................ 1

Statement of The Facts ........................................................................... 2

Statement of The Case ............................................................................ 3

    I.    Relevant Facts Concerning the Underlying Charge ............. 3

        A.    Juan Martinez's Background and Career ..................... 3

        B.    The Formation of APAC and their Patented
            Technology .................................................................... 5

        C.    FAA Certification and Wind Tunnel Testing ............... 5

        D.    APAC Signs an Information Sharing Contract with
            Gulfstream ................................................................... 6

        E.    Mr. Basaldua Asks Mr. Martinez to Consult on a
            Wind Tunnel Test Plan ................................................ 8

        F.    Mr. Martinez Works on the Program and Obtains
            Documents from Basaldua ............................................ 9

        G.    Gulfstream Confronts Basaldua and Calls in
            the FBI ........................................................................ 10

II.    Relevant Facts Relating to Order Prohibiting Defense
from Arguing Impossibility .................................................... 11

III.    Relevant Facts Related to Sentencing ................................. 18

IV.    Standard of Review ............................................................... 19

Summary of the Argument ...................................................... 20

Argument and Citation of Authority ...................................... 20

I.    The District Court Erred When It Precluded the Defense
from Arguing Legal Impossibility ......................................... 20

A.    The Prohibition on Defense Argument Was
Reversible Error ............................................................ 30

II.    The District Court's Sentencing Determination
Was Erroneous ...................................................................... 39

III.    The Evidence Presented Was Too Speculative and
Attenuated to Support a Loss Finding by a Preponderance
of Evidence .......................................................................... 53

A.    Remand for Resentencing Is Required ....................... 65

Conclusion ............................................................................... 66

Certificate of Compliance ....................................................... 67

Certificate of Service .............................................................. 68

# TABLE OF CITATIONS

**UNITED STATES SUPREME COURT CASES**                 **PAGES**

*Bradley v. Duncan*
    315 F.3d 1091 (9th Cir. 2002) ........................................................ 37

*Chambers v. Mississippi*
    410 U.S. 284 (1973) ............................................................... 30, 37

*Crane v. Kentucky*
    476 U.S. 683 (1986) ..................................................................... 36

*Jama v. State*
    543 U.S. 335 (2005) ..................................................................... 51

*Jean v. Immigration and Customs Enforcement*
    27 So. 3d 784 (Fla. Dist. Ct. App. 2010)......................................... 35

*Herring v. New York*
    422 U.S. 853 (1975) ............................................................... 30, 32

*Holmes v. South Carolina*
    547 U.S. 319 (2006) ..................................................................... 36

*Kisor v. McDonough*
    995 F.3d 1347 (Fed. Cir. 2021)...................................................... 51

*Loper Bright Enterprises v. Raimondo*
    No. 22-1219 WL 3208360 (U.S. June 28, 2024) ....................... 50, 52

*Sandifer v. U.S. Steel Corp.*
    571 U.S 220 (2014) ..................................................................... 51

*Tyson v. Trigg*
    50 F.3d 436 (7th Cir. 1995) .......................................................... 38

*United States v. Arcila Ramirez*
    16 F.4th 844 (11th Cir. 2021) ........................................................ 60

*United States v. Arias*
    431 F.3d 1327 (11th Cir. 2005) .................................................... 37

*United States v. Blanco*
    102 F.4th 1153 (11th Cir. 2024) ................................................... 60

*United States v. Brown*
    859 F.3d 730 (9th Cir. 2017) ........................................................ 32

*United States v. Cabrera*
    172 F.3d 1287 (11th Cir.1999) ..................................................... 48

*United States v. Castaneda-Pozo*
    877 F.3d 1249 (11th Cir. 2017) ................................................... 60

*United States v. Craig German*
    4:19-cr-69 ..................................................................................... 11

*United States v. Dupree*
    57 F.4th 1269 (11th Cir. 2023) ................................................. 3, 52

*United States v. Gaines*
    690 F.2d 849 (11th Cir. 1982) ..................................................... 19

*United States v. Gilbert Basaldua*
    4:19-cr-69 ..................................................................................... 11

*United States v. Grushko*
    59 F.4th 1 (11th Cir. 2022) ............................................................ 0

*United States v. Hall*
    77 F.3d 398 (11th Cir. 1996) .......................................... 19, 34, 35

*United States v. Irey*
    612 F.3d 1160 (11th Cir. 2010) ................................................... 65

*United States v. Jews*
74 F.4th 1325 (11th Cir. 2023)........................................... 20, 54, 65

*United States v. Joseph Pascua*
4:21-cr-182 ............................................................................... 11

*United States v. Lively*
803 F.2d 1124 (11th Cir.1986) ............................................... 37

*United States v. Mandhai*
375 F.3d 1243 (11th Cir. 2004) .............................................. 60

*United States v. McInnis*
601 F.2d 1319 (5th Cir. 1979) ................................................ 24

*United States v. Nixon*
418 U.S. 683 (1974) ................................................................ 30

*United States v. Ovideo*
525 F.2d 881 (5th Cir. 1976) ........................................... 14, 20

*United States v. Petit*
841 F.2d 1546 (11th Cir. 1988) .............................................. 22

*United States v. Rogers*
989 F.3d 1255 (11th Cir. 2021) .............................................. 65

*United States v. Smith*
79 F.4th 790 (6th Cir. 2023).................................................... 44

*United States v. Trujillo*
714 F.2d 102 (11th Cir. 1983) ................................................ 34

*Washington v. Texas*
388 U.S. 14 (1967) .................................................................. 36

**CONSTITUTIONS**

U.S. Const. 5th, 6th Amend ................................................................ 30

**STATUTES**

8 U.S.C. § 1231(b)(2) .......................................................................... 52

18 U.S.C. § 371 .................................................................................... 13

18 U.S.C. § 1832(a)(5) .......................................................................... 1

18 U.S.C. § 3553(a) ........................................................................ 19, 0

28 U.S.C. §1291 ............................................................................... 1, 2

USSG §1B1.3 ......................................................................... 44, 46, 47

USSG §2B1.1 ............................................................................ *passim*

## STATEMENT REGARDING ORAL ARGUMENT

Appellant Juan Martinez is requesting oral argument before the Court pursuant to 11th Cir. R. 28-1(c). This case presents unique and complex questions that are impacted by brand new Supreme Court precedent. Their resolution will be significantly aided by oral argument.

## STATEMENT OF JURISDICTION

Appellant Juan Martinez respectfully requests that this Court vacate his conviction and sentence and remand to the district court for further proceedings.

Appellant was re-indicted on November 2, 2022, for one count of Conspiracy to Steal Trade Secrets in violation of 18 U.S.C. § 1832(a)(5). [Doc 1] The district court had jurisdiction over this case under 28 U.S.C. §1291. Appellant was tried by a jury in the Southern District of Georgia and was found Guilty on August 18, 2023. [Doc. 124] Appellant filed a motion for new trial on September 1, 2023, [Doc. 125] which was denied on December 15, 2023 [Doc. 148] Following extensive briefing and oral argument on sentencing, the district court sentenced the Appellant on February 13, 2024, to 63 months in the Bureau of Prisons. [Doc 162]

1

The notice of appeal was timely filed on February 20, 2024. [Doc 165] This Court has jurisdiction over this appeal under 28 U.S.C. §1291.

## STATEMENT OF THE ISSUES

**I.**    At the close of the Government's case, the defense made a Rule 29 motion arguing legal impossibility under applicable Circuit precedent, based on the contract between Gulfstream and APAC (the company for which the Defendant was working as a consultant) granting APAC and its consultants authority to access and use Gulfstream proprietary information. The Court denied the motion. Two days later, moments before the start of closing arguments, the Government made an oral motion to preclude the defense from arguing impossibility to the jury, on the grounds that the district court had already denied the Rule 29 motion. The district court granted the motion. Did the district court err when it prohibited the defense from arguing impossibility?

**II.(A)** The sentence in this trade secrets case was driven by the loss amount calculation. However, there was no actual loss. The district court held that the word "loss" was ambiguous, and therefore relied on the Application Notes to include the concepts of "intended loss" and

2

"intended gain." Did the district court err under this Court's ruling in *United States v. Dupree*, 57 F.4th 1269 (11th Cir. 2023), which held that district courts may not rely on the Application Notes unless there is actual ambiguity in the terms of a particular Guideline provision?

**II.(B)** The district court chose for its loss amount Gulfstream's profit margin from the sale of one plane – a calculation that was untethered from any evidence in this case – and imposed a 63-month sentence. Absent that loss amount, the Guidelines range would have been 0-6 months and likely a non-custodial sentence for Defendant, an engineer with no criminal history, who was paid a total of $4,500 for his work and had no ownership or control over the company. Did the district court err as a matter of Guidelines and reasonableness analysis?

## STATEMENT OF THE CASE

I.     **Relevant Facts Concerning the Underlying Charge**

       A.     **Juan Martinez's Background and Career**

Juan Martinez is a 53-year-old engineer from Los Angeles, California. [Doc 138-Pg 42] After graduating from high school, Mr. Martinez attended Los Angeles Trade Technical College, earning an

associate's degree in mechanical drafting. [Doc 138-Pg 47] He began his

career in 1990 at McDonnell Douglas, drawing schematics of airplane

systems. [Doc 138-Pgs 50, 52] His next job was at San Onofre nuclear

power generating station. [Doc 4-Pg 52] Mr. Martinez worked at the

San Onofre plant for about two and a half years before relocating to

Savannah for his first job at Gulfstream, where he worked on

environmental control systems. [Doc 138-Pgs 61, 62] Throughout Mr.

Martinez's career, he was hired to work on discreet contracts, meaning

he moved on when the contract or project ended. From 1990 to 2023, his

career took him to De Havilland, Boeing, Curtis Wright, Northrup

Grumman, Rockwell International, Lockheed Martin, D3 Technologies,

and HondaJet, often returning to work at the same company multiple

times over the years. [Doc 138-Pgs 68, 72, 75, 102, 105, 111, 120, 122;

Ex. 47] Mr. Martinez testified that in many of his jobs, he had

experience working on joint venture projects, collaborating and

exchanging information with engineers at other companies. [Doc 138-

Pgs 57, 61, 68, 124, 125]

4

**B.    The Formation of APAC and their Patented Technology**

APAC Airplane Design Consulting, LLC, was founded by Tony Chee in 2008. [Ex. 7] Mr. Chee was the president and sole member of APAC. [Doc 139-Pg 68] Mr. Chee worked with Joe Pascua, an engineer, to develop a new de-icing technology for use on the leading edge of airplane wings. Chee and Pascua's technology was a thin material that could carry an electrical current along an airplane wing, heating the wing and preventing ice formation. This technology was significantly lighter than the prevailing method of de-icing, which relies on heavy metal tubes inside airplane wings. [Doc 137-Pgs 172, 173; Doc 138-Pgs 134] Chee and Pascua patented their technology in December 2017. [Ex. 8] It was undisputed at trial that the technology was developed, patented, and owned solely by APAC, and that Gulfstream had no right to it whatsoever. [Doc 135-Pg 201; Doc 137-Pgs 214, 215]

**C.    FAA Certification and Wind Tunnel Testing**

Chee and Pascua recruited Gilbert Basaldua and Craig German to help them develop this technology and market it to aircraft manufacturers, including Gulfstream. Chee, Pascua, and German

presented their technology to Gulfstream at a meeting in October 2017. [Ex. 6] Gulfstream engineers expressed interest in the technology but expressed concerns about the fact that it did not have the necessary certification from the Federal Aviation Authority (FAA). [Doc 137-Pgs 217, 218]

In order to obtain FAA certification, this technology would need to be subjected to a rigorous battery of tests at a wind tunnel facility. A wind tunnel is a simulator in which airplane parts are tested for their performance under a variety of simulated environmental conditions, such as wind speeds and temperatures. [Doc 137-Pgs168, 169] A company wishing to have their technology tested at a wind tunnel must submit detailed plans for what tests will be performed and how they will be performed. [Doc 137-Pgs 165, 166] The FAA does not prescribe what companies must do in the wind tunnel in order to earn certification; engineers must design their own test plan and hope that it satisfies the FAA.

**D.    APAC Signs an Information Sharing Contract with Gulfstream**

In November 2017, APAC signed an agreement with Gulfstream to share proprietary information to explore the possibility of joint development of the APAC technology. That agreement was formalized in two documents: a Request for Information ("RFI") [Ex. 22], and a Proprietary Information Agreement ("PIA") [Ex. 21]. The PIA was dated November 9, 2017, and ran through December 31, 2022, "unless sooner terminated by a Party giving thirty (30) days written notice to the other Party." [Ex. 21, p.6] The PIA expressly provided, "The purpose of this document is to exchange technical information and proposals related to wing leading edge components . . . [and] potential use in the G650 aircraft." [*Id.* at 1] The PIA further provided, "In no event will either party be liable to the other in any way related to disclosure hereunder for any punitive, exemplary, special, indirect, consequential, or incidental damages, including, without limitation, loss of use, income, [or] profits…" [*Id.* at 6]

Gulfstream never terminated the PIA. Gulfstream witness Meghan Wright admitted that the PIA remained in effect throughout the time period at issue in this case. [Doc 137-Pg 51] Under the terms of the PIA,

7

APAC was expressly permitted to obtain, possess, and utilize proprietary Gulfstream technical documents and information.

The PIA said nothing about whether the documents had to be accessed through a Gulfstream internet portal or any other specified method. [Doc 138- Pgs 49, 50] Ms. Wright admitted at trial that the PIA was not "program specific" by its terms, and that the "program specific" limitation existed only "[in] Gulfstream's mind." [Doc 138-Pgs 43, 44]

### E.  Mr. Basaldua Asks Mr. Martinez to Consult on a Wind Tunnel Test Plan

Following the meeting with Gulfstream, Mr. Basaldua contacted Mr. Martinez, with whom he had previously worked. Mr. Basaldua told Mr. Martinez about APAC's presentation at Gulfstream; "Gilbert told me that the presentation went well. Engineers really liked the concept, really liked the technology. . . . the engineers at Gulfstream were ecstatic. That's what he told me." ." [Doc 138-Pg 138] Mr. Basaldua asked Mr. Martinez to design the wind tunnel test plan for APAC's technology to be FAA certified on a Gulfstream wing. [Doc 138-Pgs 134, 135, 139] Mr. Martinez had years of experience in designing wind tunnel test plans for HondaJet and Gulfstream. Indeed, a Gulfstream

8

expert witness said, "Juan was one of the exemplary designers that you – gave good results and you gave hard stuff to, and he usually had good results." [Doc 137-Pg 198] Mr. Martinez agreed to work with APAC on a consultancy basis for the sole purpose of designing the wind tunnel plan for testing their anti-ice technology on a Gulfstream wing. [Doc 138-Pgs137, 139] Mr. Martinez's first task with APAC was to help them respond to questions from Gulfstream engineers, aimed at understanding how the APAC technology would work on Gulfstream planes. [Ex. 103; Doc 138-Pgs 135, 137, 138]

## F.    Mr. Martinez Works on the Program and Obtains Documents from Basaldua

Through his prior employment at Gulfstream, Mr. Martinez knew which Gulfstream documents contained the plans for and results from prior wind tunnel tests on Gulfstream craft. He asked Mr. Basaldua, who worked at Gulfstream, for the Gulfstream documents that would help him design the wind tunnel test plan for APAC. [Doc 138- Pgs 158, 159] Mr. Basaldua acquired the requested documents and sent them to Mr. Martinez. [*Ibid*]

9

Mr. Martinez worked for APAC as a contractor. [Doc 138-Pg 269] He was paid hourly and was told he could "potentially get profit-sharing . . . [of] two to ten percent" [*Id.* at 269] The Court below summarized, "This was a company that he did not start, he did not own, he did not manage. He was paid a grand total of $4,500 for all of his work for APAC, and he was paid as a consultant. . . . There was no evidence presented that Mr. Martinez was ever offered anything in profit sharing. There is no evidence offered that he had any prospect of control or ownership of this company. The company brought him in and hired him as a consultant to do a wind tunnel test plan, and they paid him $4,500 for it." [Doc 172-Pg 168]

## G.    Gulfstream Confronts Basaldua and Calls in the FBI

Gulfstream IT security reviewed Mr. Basaldua's activity on Gulfstream's network and found that he was accessing proprietary documents and emailing them to his personal account outside of Gulfstream. [Doc 135- Pgs 208, 209; Doc 137-Pg 83] Gulfstream contacted law enforcement and terminated Mr. Basaldua. [Doc 135-Pg 215] The FBI eventually contacted Mr. Martinez, who voluntarily submitted to two meetings with the FBI and voluntarily turned over all

10

of his communications and documentation regarding his work for

APAC. [Doc 138-Pgs 182, 183, 184] Ultimately, Mr. Basaldua, Mr.

Pascua, Mr. German, and Mr. Martinez were all charged in this case.

Mr. Chee passed away. Mr. German pleaded guilty without going to

trial. (*United States v. Craig German*, 4:19-cr-69.) Mr. Basaldua pleaded

guilty mid-trial. (*United States. v. Gilbert Basaldua*, 4:19-cr-69.) Mr.

Pascua was found guilty by a jury. (*United States v. Joseph Pascua*,

4:21-cr-182.) Mr. Martinez's case was the last to go to trial.

## II.    Relevant Facts Relating to Order Prohibiting Defense from Arguing Impossibility

One of the central pieces of evidence in this case was the

Proprietary Information Agreement between Gulfstream and APAC.

The PIA was significant because one of the principal defense theories

was that the Government could not prove the elements of the offense

because under the contract, Mr. Martinez was authorized to possess

and use the documents. Regardless of what Martinez or the others may

have thought. Conspiring to obtain and use the documents was not a

crime under section 371, as defined in the instructions, because the

thing the conspirators were charged with conspiring to do—obtaining

11

and using the documents—was not a crime. The charged crime was impossible. That is the argument the defense should have been allowed to present.

Eliciting testimony in support of this argument was a primary focus of the defense case. The defense elicited from Gulfstream's witnesses the relevant details of the contract: (1) that the contract permitted APAC to obtain Gulfstream trade secrets [Doc 135-Pgs 220, 221] (2) that the contract permitted APAC to share those trade secrets with APAC's consultants [Doc 137-Pgs 46, 47]; (3) that the contract permitted APAC and its consultants to use those documents for the wind tunnel test plan [Doc 137-Pg 18] (4) that the contract contained no specifications about how the documents were to be accessed (i.e., the contract said nothing about whether the documents had to be shared by a particular Gulfstream designee, or shared through a particular online portal) [Doc 137-Pgs 49, 50]; and (5) that the contract was never terminated and remained in force throughout the entire period charged in the case. [Doc 137-Pgs 50, 51]

The testimony on all these issues was uniformly favorable to the defense. The Gulfstream witnesses admitted on cross-examination that the putative "terms" the prosecution claimed APAC violated (such as obtaining documents that related to the G-II program rather than the G-650 program, or obtaining documents by email rather than through Gulfstream's online "Ariba" portal) *were not actually in the contract.* Indeed, one Gulfstream witness admitted that these "terms" existed only "in Gulfstream's mind." [Doc 137-Pg 44]

After the defense elicited the above testimony on cross-examination during the Government's case-in-chief, the defense moved for a judgment of acquittal under Rule 29 at the close of the Government's case, arguing that the Government had not met its burden because it had failed to present sufficient evidence that the agreed-upon act charged in the indictment was "a separate federal crime," as required by 18 U.S.C. § 371. [Doc 106; Doc 137-Pgs 231, 236]

The principal basis for the motion was legal impossibility. The defense cited governing authority providing that legal impossibility is a defense to conspiracy (unlike factual impossibility, which is not), and

defining legal impossibility as the situation in which "the actions which the defendant performs or sets on motion, even if fully carried out as he desires, would not constitute a crime." [Doc 106-Pg 5] (quoting *United States v. Ovideo*, 525 F.2d 881, 883 (5th Cir. 1976). Factual impossibility, by contrast, "occurs when the objective of the defendant is proscribed by the criminal law but a circumstance unknown to the actor prevents him from bringing about the objective." [*Id.*] The Court denied the motion. [Doc 138-Pgs 5, 19]

At the close of evidence, the jury instructions were finalized. Among the jury instructions was the following, regarding the elements of conspiracy under section 371: the Government must prove that the act the defendant agreed to do "something that would be another Federal crime if it was actually carried out." [Doc 122-Pg 6]

The parties finalized the jury charges on the afternoon of August 17, 2023, and worked on their closing arguments that night. On August 18, 2023, moments before closing arguments began, the prosecutor made an oral motion to preclude the defense from making an impossibility argument in closing. [Doc 139-Pg 47] The prosecutors

14

made the motion moments before closing argument, with no prior notice to the defense, no briefing on the motion, and no time for research or responsive briefing. The defense opposed the motion, arguing that it would be unusual and prejudicial to bar defense counsel from arguing based on the jury instructions and evidence. [*Ibid*]

Additionally, defense counsel argued, the denial of a Rule 29 motion occurs in every federal criminal trial that gets to a jury, and it is not and could not be the case that denial of a Rule 29 motion precludes the defense from making arguments in closing that it made in the Rule 29 motion. [Doc 106-Pgs 53, 54] The Government cited no authority holding or suggesting that the denial of a Rule 29 motion precludes arguments at closing. No such authority exists, to the best of defense counsel's understanding and research.

The Government argued that the Court had made "findings as a matter of law during that Rule 29 motion." [*Id.* at 54] The Court stated: "Didn't we go through all of this on the Rule 29?" [*Id.* at 52] The Court granted the motion. [*Id.* at 55] The Court stated that it disagreed with the defense's characterization of the argument as a legal impossibility

argument, and that the Court saw it as a factual impossibility argument and therefore would not permit it. [*Id.* at 56, 59] The Court ruled as follows: "You can't make the legal argument that. . . this crime was impossible because what they did was permitted by the document." [*Id.* at 61] "You can't say it would have been impossible for them to commit the crime. You cannot argue an impossibility defense." [*Id.* at 60] "You can't make the legal argument that. . . this crime was impossible because what they did was permitted by the document." [*Id.* at 61] "The motion was to preclude [defense counsel] from going the next step to say, so it would have been impossible for them to commit this crime because, you know, what was alleged has been authorized by the document. That's the next step that I've ruled upon. Okay. It's the impossibility to commit the crime. He [defense counsel] can't do that." [*Id.* at 61]

After the prosecution's closing, defense counsel asked the Court to reconsider, in light of the prosecution's closing argument asserting that there was no legitimate legal relationship between Gulfstream and APAC. [*Id.* at 120] The prosecutor stated that the Government's

16

argument had been proper because "[t]his is all in the context whether the defendant ever believed there was authorization to take these documents, not whether authorization, in fact, existed. I know they overlap quite a lot in the Venn diagram, but I think I was very clear." [*Id.* at 122] The Court reiterated its prior order: "The defendant can argue in closing that he believes the PIA authorized defendant and his alleged co-conspirators to access the documents.... Defense counsel may not argue to the jury that if the jury finds that the PIA authorized the members of APAC to access the documents, then the jury must find the defendant not guilty, or any similar argument. For instance, counsel cannot say, members of the jury, you must find the defendant not guilty because everything they did was authorized by the PIA." [*Id.* at 128]

The defense obeyed the Court's order. The prosecution then devoted the bulk of its rebuttal to repeatedly asserting that the contract was irrelevant, and the jury should disregard it. [*Id.* at 164, 169] The prosecution's rebuttal presentation, indeed, consisted mostly of an extended argument that the contract was a red herring that the jury should simply ignore, backed by a photo of a large red fish displayed on

17

the screen for the jury. [*Id.* at 163, 169] ("So, folks, that's just a great big red herring that you don't really need to pay attention to because it doesn't have any weight in the decision you need to make in this case.")] The prosecution told the jurors that they should convict Mr. Martinez because Martinez had not read the contract, and/or because APAC, including Mr. Martinez, had violated the contract in any event.

The jury convicted Mr. Martinez at approximately 8 p.m. that night. [*Id.* at 201, 202]

## III.  **Relevant Facts Related to Sentencing**

On February 9, 2024, the Court sentenced Mr. Martinez to 63 months imprisonment. [Doc 162-Pg 2]. The Court did not assign a dollar value to "actual loss." The Court found that the word "loss" is ambiguous [Doc 172-Pgs 127, 128] and relied on the Application Notes to incorporate "intended loss" and "intended gain" into its analysis. [*Id.* at p. 130] It then imposed a 20-level enhancement under USSG §2B1.1 based on a finding of intended loss of between $9.5 million and $25 million, and/or intended gain of approximately $10 million. [Doc 163-Pg

1] The Court stated that it would have imposed the same sentence under 18 U.S.C. § 3553(a) irrespective of the Guidelines. [*Id*. at 4.]

## IV.   Standard of Review

With respect to closing argument, this Court will reverse and remand where "counsel is prevented from making all legal arguments supported by the facts." *United States v. Hall*, 77 F.3d 398, 400 (11th Cir. 1996) (reversing and remanding because "the district court impermissibly restricted defense counsel's closing argument").[1] This Court reviews de novo the district court's application of the Sentencing Guidelines. *United States v. Grushko*, 59 F.4th 1 (11th Cir. 2022). Remand is required when the district court miscalculates the

---

[1] The *Hall* decision does not use the words "de novo" or "abuse of discretion," but it appears from the case that the standards of review being applied are the familiar ones of de novo review as to questions of law (viz., whether the argument counsel was seeking to make is grounded in facts, caselaw, and instructions), and abuse of discretion as to the district court's authority to control closing argument. The *Hall* decision gives no deference to the district court's ruling or analysis, indicating de novo review. The *Hall* decision cites *United States v. Gaines*, 690 F.2d 849, 858 (11th Cir. 1982), which makes an important distinction: "Absent a showing of an abuse of discretion the district court will not be reversed for limiting summation **as long as the defendant has the opportunity to make all legally tenable arguments that are supported by the facts of the case**." (emphasis added). The import of the bolded text is that review is for abuse of discretion only if the defendant is afforded his full opportunity to make all legally tenable arguments supported by the facts. If that opportunity is denied—if the defendant is not given the opportunity to make all legally tenable arguments supported by the facts—then the review is not for abuse of discretion, but rather is de novo.

Guidelines range. *United States v. Jews*, 74 F.4th 1325, 1327 (11th Cir. 2023) ("Because the district court miscalculated Jews's Guidelines range, we vacate his sentence and remand for resentencing").

## SUMMARY OF THE ARGUMENT

Mr. Martinez challenges his conviction on the grounds that the district court erred when it prohibited defense counsel from arguing legal impossibility in closing argument. Mr. Martinez further challenges his sentence on the grounds that the district court erred when it imposed sentence based on an "intended loss" calculation with an insufficient basis in the evidence of the case.

## ARGUMENT AND CITATION OF AUTHORITY

## I.    The District Court Erred When It Precluded the Defense from Arguing Legal Impossibility

The doctrine of legal impossibility is a real, longstanding, and viable theory of defense. Here is the governing law of this Circuit on the distinction: "Legal impossibility occurs when the actions which the defendant performs or sets in motion, even if fully carried out as he desires, would not constitute a crime." *United States v. Oviedo*, 525 F.2d

881, 883 (5th Cir. 1976).[2] By contrast, "[f]actual impossibility occurs when the objective of the defendant is proscribed by the criminal law but a circumstance unknown to the actor prevents him from bringing about that objective." [*Id.*] The distinction can be expressed with some degree of intuitive simplicity. Did you do the thing you set out to do, but it was not a crime? That is legal impossibility. Did you fail in doing the thing you set out to do because some circumstance prevented your intended action from occurring? That is factual impossibility. Critically, legal impossibility is a defense to conspiracy, while factual impossibility is not. [*Id.*]

The issue in this appeal is: If legal impossibility constitutes a defense to the charged offense under governing law, then was it error to prohibit defense counsel from arguing it in closing?

The district court rejected the defense's arguments on this issue both at trial and in the post-verdict new trial motion. In this appeal, the defense respectfully contends that the district court erred. The issue is not whether the district court—or the judges of this Court—would have

---

[2] Pre-split Fifth Circuit cases are binding Eleventh Circuit law.

voted to acquit based on legal impossibility. The issue is whether that argument was a legal argument grounded in the jury instructions, this Court's caselaw, and the evidence admitted at trial. If so, then the defense had a due process right to present it to the jury.

During argument on the Rule 29 motion, and thereafter in its denial of the defense's motion for a new trial, the district court analogized this case to *United States v. Petit*, 841 F.2d 1546 (11th Cir. 1988). [Doc 139-Pgs 58, 59] In *Petit*, the defendants were convicted of conspiracy to possess stolen goods. The defendants argued that, because the government had set up a sting operation with the wholesaler, who had given the goods to the undercover agents, the goods were not actually stolen, and therefore the defendants' plan was legally impossible. The Court found this argument unavailing as to the conspiracy charge. *Petit*, 841 F. 2d at 1550.

The critical distinction between this case and *Petit* is that in *Petit*, if the defendants had in fact carried out their plan (done the thing they intended to do), it *would* have been a crime. They were not legally entitled to the goods, and so if they had gotten them, it would have been

22

a crime. But they were never going to actually get them because the whole thing was a sting operation. That is *factual* impossibility, and it is not a defense to conspiracy. In cases like *Petit*, what the defendants were intending to do was still an actual crime.

By contrast, Mr. Martinez's impossibility argument was that there could not have been, and was not, any separate "other federal crime" because APAC and its consultants *were authorized* to possess the documents under the PIA. It does not matter whether Mr. Martinez in fact relied on the PIA, or ever read it. The PIA had its effect as a matter of law in authorizing Mr. Martinez's possession of the documents. The necessary "another federal crime" underlying the section 371 charge was a phantasm; it was not there, because it was legally impossible. The prosecution failed to prove that element beyond a reasonable doubt. That is an argument the defense should have been allowed to make.

Legal impossibility does not always collapse into factual impossibility. To be sure, if we described every planned action as "to do a crime," then there would be no such thing as legal impossibility, because the "action fully carried out as desired" would always, by

23

definition, be "a crime." But because our caselaw recognizes the theory of legal impossibility, and recognizes a distinction between legal and factual impossibility, *see*, *e.g.*, *United States v. McInnis*, 601 F.2d 1319, 1323 (5th Cir. 1979), we cannot simply erase that distinction through definitional sleight of hand. We cannot describe the intended act at a question-beggingly high level of generality such as "hunt out of season," or "obtain trade secrets without authorization." We have to describe it as the specific, concrete, act actually contemplated: viz., "hunt deer on October 31," or "obtain this particular Gulfstream document to use for this business purpose."

Mr. Martinez contends that this Court should rule that the defense's arguments about legal impossibility are right. However, this Court could also issue a narrower ruling, namely that the district court's disagreement with the defense's theory was not a sufficient legal basis for prohibiting defense counsel from arguing that theory in closing, so long as that theory was based on the instructions and the evidence—which it was.

24

Mr. Martinez had two separate defense theories: (1) lack of mens rea (no intent to steal because of a reasonable belief in a collaboration between the companies); and (2) the PIA made the planned "crime" legally impossible even if Mr. Martinez had the requisite mens rea. These were separate, independent defense theories, and the defense strategy throughout trial depended on setting the stage for both, so that the defense could argue in closing, "You should believe Mr. Martinez when he says he did not intend to steal. But if you are persuaded by the Government's willful blindness argument, you still should acquit, because the PIA made this 'crime' legally impossible even if Mr. Martinez thought it was a crime." A major component of the defense case was eliminated, without briefing, in the moments before closing argument. That was structural error.

The PIA says that Gulfstream and APAC agree to exchange technical information about the wing leading edge system, including proprietary information. [Ex. 21, Par. 1] The PIA says that APAC can share documents with consultants like Martinez. [Ex. 21, Par. 4] The PIA says it remains in effect until Dec. 31, 2022, and all the witnesses

25

agreed that it was never terminated. [Ex. 21, Par. 5]; [Doc 137-Pgs 50,

51] The Gulfstream witnesses agreed that technical information from

prior projects, test plans and reports from prior tests, and general

technical documents like the "finish and process codes" were relevant to

any technical work on Gulfstream planes. [Ex. 29, Pg. 3; Doc 137-Pgs

148, 149, 166] Gulfstream's witnesses also agreed that "there is nothing

in the PIA that specifies how exchanges of information are to be taking

place." [*Id.* at 49, 50]

The defense should have been permitted to argue to the jury the

following:

· You were instructed that the agreed-upon act had to be a

separate federal crime.

· The act of obtaining and using these documents as Mr.

Martinez was not a separate federal crime because it was

authorized by the PIA.

· Even if Mr. Martinez did not know about the PIA, and/or

believed that obtaining the documents was a crime, it was

impossible for him to commit a crime by obtaining and using the documents as he did, because doing so was in fact authorized.

This argument was especially critical for the defense because the Government argued, at length, in both its summation and its rebuttal, that the PIA was irrelevant because Mr. Martinez did not read the PIA, so it could not have affected his mens rea. The defense was prohibited from responding that that the PIA was relevant independently of Mr. Martinez's mens rea, and that the jury could acquit Mr. Martinez even if it believed that Mr. Martinez intended to take the documents without authorization, or was willfully blind to the others having that intention. The whole point of the argument the defense was prohibited from making was that the PIA's relevance was not as to Mr. Martinez's mens rea, but rather as to the "separate federal crime" element.

It is not consistent with due process to preclude defense counsel from making an argument, based directly on the jury instructions, about why an exhibit supports acquittal. It is doubly violative of due process to enforce that prohibition when the prosecution devotes a substantial portion of its own summation to arguing that that exhibit is

27

a "red herring." The defense's argument would have been squarely based on the jury instructions ("separate federal crime") and the evidence (the PIA). The preclusion of that argument was devastating for the defense.

Precluding the defense from making the impossibility argument based on the contract constituted structural error and was significantly and unfairly prejudicial to the defense, for three reasons: first, the defense was prevented from making an argument that the jury might have accepted; second, a significant part of the defense's trial strategy throughout the case had been to bring out facts supporting this argument; and third, the prosecution, after successfully moving to preclude the defense from arguing this theory, devoted much of its own closing to arguing based on the contract.

Additionally, it was error for the court to rely on its denial of the defense's Rule 29 motion as a basis for prohibiting defense counsel from making the impossibility argument to the jury. Denial of a Rule 29 motion means only that in the court's determination, there is sufficient evidence on which a rational jury might convict. It does not foreclose the

28

defense from making those arguments to the jury. If the court's denial of a Rule 29 motion on a particular theory precluded defense counsel from arguing that theory at closing, then the jury would be superfluous, and the court's Rule 29 ruling would supplant jury deliberation on that issue.

In sum, it was error for the district court to preclude the defense from arguing that the contract authorized Mr. Martinez's obtaining, possessing, and using these documents, regardless of whether Mr. Martinez personally relied on or even read the contract, and that the charged crime therefore legally impossible. The defense has a due process right to make arguments to the jury from the jury instructions. That right is always important, but its importance only increases when the prosecution exploits the prohibition to focus on the issue in question, knowing that the defense will be hamstrung in its response. The district court did not agree with the defense's legal impossibility argument, and clearly said so. That is not, however, a sufficient reason to prohibit the defense from making the argument to the jury. The argument was based on the jury instructions, and the defense at issue

is one recognized in controlling caselaw. The defense was entitled to make the argument and let the jury decide. The district court overstepped its proper bounds and usurped that role.

## A.     The Prohibition on Defense Argument Was Reversible Error

The error in prohibiting defense counsel from arguing to the jury a defense theory based on the instructions and the evidence is a reversible error.

"[F]ew rights are more fundamental than that of an accused to present his own defense." *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973); U.S. Const. 5th, 6th Amends. This right is a necessary and integral component of an adversary system of justice. *United States v. Nixon*, 418 U.S. 683 (1974). The Sixth Amendment right to the assistance of counsel guarantees a criminal defendant the right to present his defense, and "the opportunity to participate fully and fairly in the adversary factfinding process." *Herring v. New York*, 422 U.S. 853, 858 (1975).

The need to ensure a defendant's right to present a defense and his right to counsel is rarely more significant than in closing argument.

30

The Supreme Court has explained that "[i]n the 16th and 17th centuries, when notions of compulsory process, confrontation, and counsel were in their infancy, the essence of the English criminal trial was argument between the defendant and counsel for the crown." [*Id.* at 860] Later, "[i]n the Colonies . . . common practice, if not right, apparently gave to the accused the opportunity to sum up his case in closing argument." [*Id.* at 861] n.12. "There can be no doubt that closing argument for the defense is a basic element." [*Id.*] "[N]o aspect of [partisan] advocacy could be more important than the opportunity finally to marshal the evidence for each side before submission of the case to judgment." [*Id.* at 862] Counsel's ability to marshal the facts into summation, "serves to sharpen and clarify the issues," allows counsel to "argue the inferences to be drawn from all the testimony, and point out the weaknesses of their adversaries' positions. And for the defense, closing argument is the last clear chance to persuade the trier of fact that there may be reasonable doubt." [*Id.*] Thus, while a trial court may "limit arguments that are unduly time consuming, stray unduly from the mark, or otherwise impede the fair and orderly

31

conduct," making requirements that work to deny "an accused the right to make final arguments on his theory of the defense denies him the right to assistance of counsel." *United States v. Brown*, 859 F.3d 730, 734 (9th Cir. 2017) (citation omitted); *Herring*, *supra*, 422 U.S. at 862.

Limitations of closing arguments not only impact the right to counsel but can further infringe on a defendant's broader Sixth Amendment right to present his defense. In *Brown*, the defendant was charged with conspiring to make, print, or publish "any notice or advertisement seeking or offering" child pornography. *Brown*, supra, 859 F.3d 730, 734. The defense requested a more specific definition of the terms "advertisement," "advertise," and "notice," and the court determined that it would instruct the jury to use the ordinary meaning. [*Id.* at 732] The government then "raised its concern that Brown's attorney would argue in closing that because the Dark Moon was a closed board, that somehow it cannot constitute an advertisement,'" and asserted that argument was inconsistent with the law. [*Id.*] Defense counsel affirmed that he intended to argue that a "closed board" does not constitute an "advertisement," and argued he had a constitutional

right to present his defense. The district court ordered him not to make the argument.

The Ninth Circuit reversed, holding that the district court committed structural error by ruling as matter of law the closed nature of bulletin board on which defendant's postings occurred was irrelevant to whether an "advertisement" or "notice" had been shown. The court found this was a violation not only of the defendant's fundamental right to assistance of counsel but also his right to present a defense. The court found that the district court may not preclude a defendant's defense based on the court's conclusion that "the government had met its burden as to that element of the statute." [*Id.* at 734] The court held "it was error for the district court to prevent Brown from arguing that the government failed to meet its burden." [*Id.*] The court recognized that doing so would relieve the government from its burden to prove its case beyond a reasonable doubt. [*Id.* at 736] The Court further explained that the defendant did not need to prove that his defense "would have succeeded." [*Id.*] "'[N]o matter how strong the case for the prosecution may appear to the presiding judge,' Brown had the right to

33

present a defense that was not precluded as a matter of law." [*Id.*] "The
fact that other convictions with certain similar facts, have been upheld
on appeal does not foreclose Brown from making similar distinguishing
factual arguments to the ones those defendants made." [*Id.* at 737]
(citations omitted).

The principal Eleventh Circuit case is *United States v. Hall*, in
which this Court reversed a conviction because of the district court's
limitations on defense counsel's arguments. The core passage is worth
quoting in full:

> In conclusion, Hall's counsel sought to speak of and to apply
> the accepted definition of reasonable doubt to the inconsistent
> testimony of the two witnesses; again counsel was completely
> blocked. For arguing points of law, we have held that counsel is
> confined to law that is included in the judge's charge to the jury.
> *See United States v. Trujillo*, 714 F.2d 102, 106 (11th Cir. 1983).
> Implicit in this rule is that counsel is allowed to point out legal
> concepts that will be included in the jury charge. Hall's counsel
> was permitted to develop fully the factual inconsistencies in
> Bridge's and McIntyre's testimony. But, by refusing to allow Hall's
> counsel to apply the accepted definition of reasonable doubt-a
> term which was included in the judge's charge to the jury-to those
> inconsistencies, Hall's counsel was denied the opportunity to make
> strongly the essential point that the inconsistencies raised
> reasonable doubt.

34

Hall's counsel was entitled to speak to the jurors some about the concept of reasonable doubt. The district court abused its discretion in limiting Hall's counsel too much as counsel delivered his closing argument. We reverse Hall's conviction and remand for new trial in accordance with this opinion.

*United States v. Hall*, 77 F.3d 398, 400–01 (11th Cir. 1996) (abrogated as to ACCA sentencing issues, but still controlling authority for the closing argument holding, see, e.g., *Jean v. State*, 27 So. 3d 784, 787 (Fla. Dist. Ct. App. 2010) (reversing conviction where trial court precluded defense counsel from arguing, in escape case, that the defendant was not in "lawful custody.")).

The two cases are on all fours. In this case, as in *Hall*, the court permitted counsel to discuss the facts and evidence, but precluded defense counsel from arguing the jury instructions as they applied to the evidence. Counsel in the instant case was permitted to say, "Look at the contract; look at its terms," but was prohibited from connecting the dots to the "another federal crime" instruction, and say: "Because of the contract's terms, obtaining and using these documents was not 'another federal crime.'" Counsel should have been permitted to make that argument, regardless of whether the district court agreed with it.

35

In *Hall*, defense counsel was precluded from making an argument applying the reasonable doubt instruction to inconsistencies in witness testimony. In this case, defense counsel was precluded from making an argument applying the "another federal crime" instruction to the PIA. The same result—reversal and retrial—is appropriate in both cases.

Additionally, restricting summation may infringe upon a defendant's constitutional right to present a complete defense under the Due Process and Compulsory Process Clauses. *See generally Holmes v. South Carolina*, 547 U.S. 319 (2006) (state evidentiary rule restricting evidence of third-party guilt violated constitutional right to present a complete defense). As the Supreme Court has explained, "an essential component of procedural fairness is an opportunity to be heard" and, thereby, to subject the government's case to "the crucible of meaningful adversarial testing." *Crane v. Kentucky*, 476 U.S. 683, 690-91 (1986) (citation omitted). Courts also recognize that the right of a defendant to present a defense is "a fundamental element of due process of law." *Washington v. Texas*, 388 U.S. 14, 19 (1967). It constitutes one of the

36

"minimum essentials of a fair trial." *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973).

A criminal defendant has the right to a jury instruction on his theory of defense. *United States v. Arias*, 431 F.3d 1327, 1340 (11th Cir. 2005). The burden of presenting evidence sufficient to support a jury instruction on a theory of defense is "extremely low." [*Id.*] "[T]he defendant is entitled to have presented instructions relating to a theory of defense for which there is any foundation in the evidence, even though the evidence may be weak, insufficient, inconsistent, or of doubtful credibility." *United States v. Lively*, 803 F.2d 1124, 1126 (11th Cir. 1986) (internal marks omitted). The Court's disagreement (e.g., in a Rule 29 ruling) with that theory is not sufficient to refuse an instruction; in reviewing the evidence adduced, the court must view the evidence in the light most favorable to the accused. *Arias* 431 F.3d at 1340.

As the Ninth and Seventh Circuits have observed, the "right to present a defense "would be empty if it did not entail the further right to an instruction that allowed the jury to consider the defense."' *Bradley*

37

*v. Duncan*, 315 F.3d 1091, 1099 (9th Cir. 2002), *citing Tyson v. Trigg*, 50 F.3d 436 (7th Cir. 1995). Thus, the failure to "correctly instruct the jury on the defense may deprive the defendant of his due process right to present a defense." [*Id.*]

Giving an instruction but prohibiting the defense from presenting an argument about how that instruction applies to the admitted evidence has the same effect as refusing to give the instruction at all. Here, the Court gave a legally correct instruction ("It is a separate federal crime for anyone to conspire or agree with someone else to do something that would be another federal crime if it was actually carried out.") but ordered the defense not to argue, based on that instruction and the admitted evidence, that the defendant was not guilty:

> [D]efense counsel may not argue to the jury that if the jury finds that the PIA authorized the members of APAC to access the documents, then the jury must find the defendant not guilty, or any similar argument. For instance, counsel cannot say, members of the jury, you must find the defendant not guilty because everything they did was authorized by the PIA.

[Doc 139-Pg 128]

That has the same legal effect as not giving the instruction. The "another federal crime" instruction might as well not have been given,

38

because the defense was prohibited from arguing for acquittal from that instruction, based on the evidence. Instructions are only meaningful if they can guide deliberations, and they will only guide deliberations to the extent attorneys explain how they apply to the evidence. The purpose of jury instructions is frustrated when defense counsel is forbidden from asking the jury to acquit his client based on a jury instruction as applied to the evidence.

For the foregoing reasons, the district court's order prohibiting defense counsel from arguing legal impossibility in closing was reversible error, requiring vacatur and remand.

## II. The District Court's Sentencing Determination Was Erroneous

The base offense level in this case was 6; the adjusted offense level was 26. Thus, the sentence was driven almost entirely by the "loss" calculation. Since there was no actual loss, that calculation became an "intended loss" calculation. The parties briefed and argued extensively the issue of the intended loss calculation. [Docs 149, 150, 158, 159, 160]

At the sentencing hearing, the parties first addressed Gulfstream's claim that it had suffered an actual loss. Gulfstream made

39

this claim to the probation officer but refused to provide documentation to support it. Then, at sentencing, a Gulfstream representative testified and again was unable to provide a factual basis for a claim of actual loss. She repeatedly referred to "numbers," but was completely unable, both on questioning from the defense and questioning by the court, to explain how those numbers were created, who created them, and what they referred to. [Doc 172-Pgs 34, 35, 36, 37, 40] She expressly admitted that Gulfstream had not lost any documents and continued to use them just as it always had. [*Id.* at 44] She testified that there had been no change in the way Gulfstream used these documents. [*Id.* at 48]

After hearing evidence and argument, the court agreed with the defense that Gulfstream's claims of actual loss were insufficiently grounded in evidence. "The evidence that's been presented to me about the actual value of the documents, including the cost that went into creating those documents, is too speculative." [*Id.* at 129]

Accordingly, the court turned to "intended loss" and "intended gain" as set forth in the Guidelines. The court based its sentence on the following two calculations. First, the court stated that it would base its

40

sentence on a finding that APAC had the intent to sell its anti-ice technology to a company that might compete with Gulfstream and cut into Gulfstream's market share. [*Id.* at 132] The court then stated that it would attribute to Mr. Martinez the intent to deprive Gulfstream of the sale of one plane [*Id.* at 133, 134] and reached an "intended loss" number based on the Gulfstream employee's testimony about Gulfstream's profit margin per plane.

There was no evidence or testimony in this case about anyone intending to deprive Gulfstream of any planes at all. The court utilized the following chain of reasoning: (1) If the APAC system obtained FAA approval; and (2) if APAC obtained financing to develop the system; and (3) if APAC successfully brought the system into production; and (4) if Gulfstream did not purchase the APAC system; and (5) if a Gulfstream competitor bought the APAC system; and (6) if the APAC system was superior to all existing anti-ice systems; and (7) if the Gulfstream competitor was able to leverage the system's superiority to undercut Gulfstream on price; then (8) Gulfstream might lose the profits from the sale of a plane.

41

None of the above actually occurred. None of the above came close to occurring, and no testimony or evidence suggested any likelihood of any of the above occurring. In fact, the APAC system was never built, tested, approved, sold, or installed on a single plane. Gulfstream was not interested in the technology, and the prosecutor openly mocked it as "high-tech tinfoil." [Doc 135-Pg 146]

Second, the Court found that Mr. Martinez had the intent to obtain a 2 to 10 percent equity stake in APAC. [Doc 172-Pg 135] In fact, Mr. Martinez never had any equity stake in APAC and APAC never offered him any. Mr. Martinez's sole compensation for his work as a consultant was $4,500. The basis for the Court's finding of a "2 to 10 percent equity stake" was Mr. Martinez's testimony that he hoped that he "could potentially get profit sharing, a number, I believe, 2 to 10 percent is what I was told." [Doc 138-Pg 269]

The Court determined the dollar value of this "potential profit sharing" to be approximately $10 million. That determination was based solely on an unsupported assertion by APAC founder Tony Chee in an email to Joe Pascua and Gilbert Basaldua, on which Mr. Martinez

was the third of three carbon copied recipients. [Ex. 64] In the email, Mr. Chee speculated about the potential market for the anti-ice system, if it could be tested, gain FAA approval, and prove to be superior to existing systems. "[T]he revenue projection [for use on new planes] will be smaller than the Retrofit Market. I think it will be still between $500 million to $1 billion. This is still a big market." [*Id.*] The Court noted that by either method—intended loss of the Gulfstream profit from selling one plane, or intended gain of potential profit sharing—it reached a §2B1.1 loss amount of between $9,500,000 and $25,000,000, resulting in a 20-level upward adjustment.

First, the district court erred under *United States v. Dupree,* 57 F.4th 1269 (11th Cir. 2023), by relying on the Advisory Committee's Application Notes in the absence of textual ambiguity. The district court found that the term "loss" as used in Guidelines section 2B1.1 is ambiguous, and thus that reliance on the Application Notes is warranted. That is a question of law this Court reviews de novo, and it is a question of first impression for this Court. There is a 2023 case from the Sixth Circuit holding that the term "loss" is ambiguous in section

43

2B1.1. There is no Eleventh Circuit case addressing the issue, nor is there one from any other Circuit.

Moreover, the Sixth Circuit's analysis is unpersuasive, because it is both circular and non sequitur. The Sixth Circuit acknowledges that "the dictionary definition of the term 'loss' does not contemplate anything close to intended loss," *United States v. Smith*, 79 F.4th 790, 798 (6th Cir. 2023), and never identifies any source (caselaw, statute, literature, anything) in which the word "loss" means "intended loss"— let alone "intended gain." The Sixth Circuit's reasoning is that the term is ambiguous because a different section of the Guidelines (the relevant conduct instruction, §1B1.3) directs the sentencing court to consider, inter alia, "all harm that was the object of such acts and omissions." *Smith*, 79 F.4th at 798. That provision, of course, does not use the term "loss," nor does it define "harm" as "intended harm." Nonetheless, the Sixth Circuit concludes that the fact that the relevant conduct guideline in §1B1.3 directs the court to consider "harm that was the object" of the offense somehow renders the word "loss" in §2B1.1 ambiguous. [*Id.*] The Sixth Circuit asserts that if the term "loss" in §2B1.1 actually had the

meaning of the word "loss," then it would be impossible "to meaningfully apply the relevant-conduct guideline." [*Id.*]

The Sixth Circuit's conclusion lacks merit, and this Court should not adopt it. There are two principal defects to the Sixth Circuit's reasoning. First, the question of whether a word is ambiguous is a question about the *word*. A word is ambiguous when it might reasonably be read with two different meanings. That is simply not the case with the word "loss" in the Sentencing Guidelines—*unless* we turn to the Application Notes, which, under *Dupree*, we cannot do unless there is an ambiguity in the underlying substantive guideline. And nothing anywhere in Section 2B1.1 tells us that "loss" has some expanded, non-standard meaning. Nor does anything else in any other substantive Guidelines provision. The *only* place an expanded non-standard meaning appears is in the Application Notes themselves, and so we cannot, under *Dupree*, use the non-standard meaning *in* the Application Notes as the justification for relying on the Application Notes in the first place.

The Sixth Circuit's reasoning is non sequitur as well. The assertion it would not be possible to meaningfully apply the relevant conduct guideline in §1B1.3(a)(3) unless the word "loss" in §2B1.1 also meant "intended loss" is just not true. Undersigned counsel has been calculating Guidelines sentences for nearly 20 years. He has carefully read the *Smith* opinion, and carefully attempted to ascertain how interpreting "loss" as "loss" in §2B1.1 would render it impossible, or even difficult, to apply the relevant conduct analysis in §1B1.3. He is unable to do so. Section 1B1.3 begins with the words "unless otherwise specified." That is, unless otherwise specified by a particular substantive guideline section, the Court should calculate offense levels and adjustments based on the facts identified in subsection (a)(1)(A)(1-4). The Sixth Circuit's analysis completely omits the "unless otherwise specified" language, which—as undersigned counsel was taught to use the Guidelines and has used them on both sides of hundreds of criminal cases over the past two decades—means that if a substantive Guidelines provision specifies what the offense level is to be based on,

46

then you use that. If it does not ("unless otherwise specified"), then you go to (a)(1)(A)(1-4).

That is the whole point of beginning §1B1.3 with the words "**unless otherwise specified**." Most of the substantive provisions of USSG Section 2 *specify* what the offense level is to be based on. Section 2B1.1 is paradigmatic in this respect: it is a table with a a list of loss amounts in the left-hand column, and a list of offense levels in the right-hand column. It uses the adjectival form of the verb "*specify*": "*Specific* Offense Characteristics." It then *specifies*: "If the loss exceeded $6500, increase the offense level as follows…" It then lays out the "Loss Table" with a column for "Loss" and a column for "Increase in Level." This is a table that specifies levels based on specific dollar figures. This is a textbook example of a Guideline that "otherwise specifies."

There are plenty of Guidelines sections that warrant discussion of, and argument about, the scope of §1B1.3 relevant conduct and how relevant conduct should factor into the calculation. But the loss table in §2B1.1 is just not one of them.

47

This takes us to the circularity of the Sixth Circuit's reasoning. It is circular and fallacious to argue that because lawyers and courts, prior to *Dupree*, routinely considered "intended loss" to be part of "loss" under §2B1.l *because the Application Notes said so*, that the term "loss" should now, after *Dupree*, be considered "ambiguous" for the purpose of determining *whether to look at the Application Notes in the first place*. Before *Dupree*, a lawyer using the §2B1.1 loss table to calculate a Guidelines range would routinely include a calculation for intended loss as part of his analysis. (He would then ponder whether there was sufficient "reliable and specific evidence" to meet the required preponderance threshold, *see, e.g.*, *United States v. Cabrera*, 172 F.3d 1287, 1292 (11th Cir. 1999).) But the reason the lawyer would include an intended loss calculation as part of his analysis was that, prior to *Dupree*, practitioners—undersigned counsel included—simply read the Application Notes as part of the Guidelines sections to which they were appended. It was *not* part of the ordinary practitioner's understanding of how to use the Guidelines, prior to *Dupree*, to only look at the

48

Application Notes if there was genuine textual ambiguity in the Guideline text itself.

The point is this: the fact that §2B1.1 has been routinely read in the past to include "intended loss" does not mean that the word "loss" is ambiguous. It just means that there was no *Dupree* case telling lawyers not to go to the Notes unless there was ambiguity in the guideline. So, it is circular to argue that because past cases, before *Dupree*, used intended loss as part of relevant conduct for applying §2B1.1, we should continue doing so after *Dupree*.

So, too, with the district court's finding that the term is ambiguous because, inter alia, the two lawyers argued about it extensively. [Doc 172-Pg 128] or that the Guidelines cover "a broad swath of offenses." [*Id.*] These facts do not make the word "loss" ambiguous.  Defense counsel argued at sentencing that "we have to find ambiguity first before going to the notes," and that the term "loss" is not ambiguous, and that therefore we should "follow the plain text of the guideline." [Doc 172-Pg 77.]

"Loss" is not an ambiguous word. It means things actually lost. The Application Note adding "intended loss" as an additional meaning cannot *create* the ambiguity, because under *Dupree*, there must *be* ambiguity in the Guideline provision itself *before* we can even consult the Application Notes.

Indeed, under the recently decided *Raimondo* case, courts arguably should not rely on the Application Notes at all. *Loper Bright Enterprises v. Raimondo*, No. 22-1219, 2024 WL 3208360 (U.S. June 28, 2024). We will be arguing about the scope of *Raimondo* for quite a while, undoubtedly, but at a minimum, it seems clear that *Raimondo* teaches that a court cannot use Application Notes as the basis for a finding of ambiguity in a word. Courts are quite competent, and under *Raimondo*, probably now obligated, to decide for themselves what ordinary English words mean. "Loss" is not a complicated chemical formula about pollutants. It is a simple and well-understood word. It is not inherently ambiguous in ordinary English, and the Guidelines do not provide a definition. Accordingly, we should turn under ordinary canons of interpretation to basic interpretive sources.

50

"It is a fundamental canon of statutory construction that, unless otherwise defined, words will be interpreted as having their ordinary, contemporary, common meaning." *Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 227 (2014) (determining that the word "clothes" is not ambiguous and has a clear meaning in ordinary English). Canons aid in text analysis and give insight into what was common in society at the time the statute was enacted. *Kisor v. McDonough*, 995 F.3d 1347, 1349 (Fed. Cir. 2021) (citations omitted). When a legislature uses an English word in an understandable English sentence, we should interpret the word and sentence in their ordinary English meanings. The Guideline itself only mentions "loss"; "intended loss" is only found in the commentary. The plain meaning of "loss" is "actual loss": "the condition of being deprived of something." American Heritage Dictionary of the English Language (5th ed. 2022); see also, e.g., Meriam-Webster Dictionary ("destruction"; "fact of being unable to keep or maintain something"); Oxford English Dictionary ("the fact of losing something").

Had the drafters wanted to provide a specific non-standard definition in the Guideline, they could have done so. *See*, *e.g.*, *Jama v.*

51

*Immigration and Customs Enforcement*, 543 U.S. 335, 342-43 (2005) (explaining that if Congress wished to add an "acceptance by the other country" element into the concept of "removal" in 8 U.S.C. § 1231(b)(2) it could have done so, and because it did not do so, courts shall not import it). When they do not, then courts will use the ordinary meanings of the words as found in the statute. Under *Dupree*, the Application Notes are not to be relied on unless the term in the Guideline itself is ambiguous. Here, the non-standard "expansions" of the meaning of the term "loss" are found *only* in the Application Notes, which is forbidden under *Dupree* unless the Guideline provision itself is ambiguous. *United States v. Dupree*, 57 F.4th 1269, 1274-1275 (11th Cir. 2023).

Here, without first looking at the Application Notes, there is no ambiguity; thus, there is no basis under *Dupree* (or *Raimondo*) for relying on the Application Notes. (*Raimondo* goes further and says that we should no longer look to agencies to interpret these ambiguities in general. *Loper Bright Enterprises v. Raimondo*, No. 22-1219, 2024 WL 3208360 at *15, *22 (U.S. June 28, 2024). Therefore, after the district

court correctly found that the loss theory put forward by the Government and Gulfstream lacked a sufficient evidentiary basis to support a finding of actual loss, the inquiry should have ended.

## III.  The Evidence Presented Was Too Speculative and Attenuated to Support a Loss Finding by a Preponderance of Evidence

Defense counsel argued that there was no actual loss and no actual gain, and that the bases for intended loss or intended gain proffered by the Government, Probation, and Gulfstream were too speculative to support an upward adjustment by a preponderance of the evidence. [Doc 160-Pgs 1-3; Doc 158-Pgs 14-25]

The post-*Booker* sentencing legal landscape is well defined. Sentencing must begin with a Guidelines calculation. The district court must correctly calculate the Guidelines sentence. After having correctly calculated the Guidelines sentence, the district court may impose a non-Guidelines sentence—but it must first get the Guidelines calculation right. The Guidelines are advisory, but a correct Guidelines calculation is a necessary prerequisite to imposition of a legal sentence.

53

Nor can a court avoid the requirement of a correct Guidelines calculation by simply stating that it would give the same sentence regardless of the Guidelines. Otherwise, the correctness of the Guidelines calculation would be entirely irrelevant. In fact, this Court remands for resentencing when a district court misapplies the Guidelines, see, e.g., *United States v. Jews*, 74 F.4th 1325, 1327 (11th Cir. 2023) ("Because the district court miscalculated Jews's Guidelines range, we vacate his sentence and remand for resentencing").

As stated, the sentence here was driven entirely by the loss amount. The base offense level was 6. For a defendant like Mr. Martinez, with no criminal history, that is a Zone A sentence with a range of 0-6 months and alternative sentences like probation or home confinement available. Everything turned on the loss amount.

And there was no actual loss. None. The documents at issue in this case were test plans from old Gulfstream wind-tunnel tests, which Mr. Martinez used as templates in creating the plan for APAC's test. [Doc 138-Pg 161] In addition to the old test plans, Mr. Martinez used a "parts codes" document that was a glossary of the various numeric codes

54

used for Gulfstream parts, so that he could decipher the test-plan documents. [Doc 138-Pgs 171, 174] The court correctly rejected as "too speculative" the efforts by Gulfstream and the Government to argue for a loss figure of these documents based on the asserted (but unspecified) aggregate labor-value of all of the employees who had made any contribution to them, or that Gulfstream had in fact lost any of that value. [Doc 172-Pgs 129-130.]

The evidence, of course, showed the contrary: namely, that Gulfstream continues to use these documents in its operations (so has not been "deprived" of their use); and that Gulfstream routinely provides these documents to third-party contractors it works with (such as APAC). [Doc 172-Pg 48; Doc 138-Pgs 174, 175] Thus, the fact that Mr. Martinez saw them does not reduce their value to Gulfstream by one iota. Nor did the Government's speculation that the documents might be "out there," [Doc 172-Pg 72] provide a basis for claiming a "loss." There was no evidence for that speculation.

There was no dispute that APAC owned the patent for its anti-ice system; that Gulfstream had no legal right to prevent APAC's system

from being developed or tested; that Gulfstream did not want APAC's system in any event; that Gulfstream rejected the opportunity to develop the system with APAC; that APAC never finished its testing or development; and that APAC's system has never been tested, built, or installed on any aircraft. [Doc 172-Pg 21-25]. So, where is the "loss"? There is none.

The analysis should have stopped with the absence of actual loss. The absence of sufficient evidence for any dollar value of actual loss should have resulted in a Guidelines calculation under §2B1.1 using the base offense level of 6. Instead, the district court engaged in a sua sponte "intended loss" determination that was based on the following chain of assumptions (all of which are counterfactual)

1.    Assume APAC continued with its testing.

2.    Assume APAC got FAA certification.

3.    Assume APAC obtained the necessary outside investment to move to actual product development.

4.    Assume APAC then reached an agreement or partnership with an aircraft company to install its system.

5.    Assume that company was one of Gulfstream's competitors.

6.    Assume that APAC's system was significantly more efficient than existing systems.

7.    Assume that at some unspecified future point, Gulfstream's competitor exploited that increase in efficiency to cut into Gulfstream's market share.

8.    Assume that none of the above would have happened *at all* (as opposed to simply happening one year later than it otherwise would have, which was the evidence at trial) without APAC's use of the Gulfstream documents.

9.    Assume that at some unspecified future point, Gulfstream lost out on the sale of one plane that it otherwise would have made, because a prospective buyer preferred a competitor's model that had the APAC anti-ice system.

10.    Assume that all of the above was the actual or reasonably foreseeable intention of Mr. Martinez or the conspiracy at the time Mr. Martinez joined it or acted in furtherance of it.

57

The district court ruled that it was foreseeable to Mr. Martinez that APAC intended to deprive Gulfstream of the profits from the sale of a plane, and selected that dollar value as the "intended loss." [Doc 172-Pg 130-134] That ruling necessarily entails the chain of assumptions above. But there was no evidence for any of the assumptions in the chain, and no evidence for the selection of the profit from a single plane sale as the "intended loss."

The defense argued the absence of such evidence. [See, e.g., Docs 149, 158, 160; Doc 172-Pg 92-95, 103-105, 111-120] The closest the evidence came to intersecting with any of the above hypothetical assumptions was No. 6, that APAC's system would have been significantly more efficient than Gulfstream's existing system. That evidence was APAC's pitch presentation to Gulfstream, in which APAC claimed that their system would save approximately 550 pounds of weight. [Doc 172-Pg 12]

At some point, there must be a limit to how far a chain of hypotheticals can be stretched to create an "intended loss." Say a mugger robs a man of his wallet. The wallet had a five-dollar bill and a

Lotto ticket in it. How do we measure loss (or "intended loss," if we are using that category)? Would it be permissible for a court to find an "intended loss" of $50 million on the basis of hypothetical conjecture that the Lotto ticket *could* have been the winning ticket (it was not), and the jackpot *could* have been $50 million (it was not).

Such reasoning would go as follows: the defendant intended to harm the victim; the defendant intended to harm the victim by taking whatever was in his wallet; the Lotto ticket in the wallet *might* have been the winning ticket, and if so the defendant would have deprived the victim of the value of the jackpot; and the Lotto jackpot *might* have built up to a $50 million prize; and the defendant might have found a way to cash it in without anyone learning it was stolen.

All of the above would be contrary to the facts proven—namely, that the ticket did not have the winning number; the jackpot was not $50 million; and the defendant most likely could not have cashed it in successfully. So while we can always describe the crime at the highest level of generality, and describe the defendant's intention as "take what's in the wallet," and describe the "intended loss" as "whatever

hypothetically could have been in that wallet," surely such terminological framing cannot transform a five-dollar Guidelines "actual loss" calculation into a $50-million "intended loss" calculation.

In fact, the Guidelines do preclude this sort of speculation, by requiring that sentencing findings be made by a preponderance of the evidence. *United States v. Arcila Ramirez*, 16 F.4th 844, 855 n.8 (11th Cir. 2021) ("[T]he preponderance of the evidence standard is sufficient to establish the predicate facts for a sentencing adjustment or enhancement."). The Court's "intended loss" and "intended gain" findings were not supported by a preponderance of the evidence. (And additionally, as noted above, the Court was not permitted to make an "intended gain" finding as well as an "intended loss" finding.") "A challenge to the application of the Sentencing Guidelines is a mixed question of law and fact." *United States v. Mandhai*, 375 F.3d 1243, 1247 (11th Cir. 2004). The "application of those [sentencing] facts to justify a sentencing enhancement is reviewed de novo." *United States v. Castaneda-Pozo*, 877 F.3d 1249, 1251 (11th Cir. 2017) (citation omitted); *see also United States v. Blanco*, 102 F.4th 1153, 1165 (11th Cir. 2024).

60

The court's alternative justification for its 20-level enhancement based on "intended gain" is equally erroneous. If there was no actual loss to Gulfstream at all, then under the Guidelines, intended gain is not an appropriate analysis at all. Under section 2B1.1, Application Note 3(B), "the court shall use the gain that resulted from the offense as an alternative measurement of loss only if there is a loss but it reasonably cannot be determined."

It was therefore procedurally erroneous for the court to calculate a number both for intended loss and for intended gain, under the Application Note. If the "intended loss" figure could be determined, then the court could not use intended gain. In other words, if the court's first calculation was proper, the second was ipso fact error.

In addition, the district court's "intended gain" calculation was deficient both factually and analytically. The court's "intended gain" figure (2 percent of $500 million dollars, or $10 million), [Doc 172-Pg 135], was lacking in evidentiary support and unreasonable. The district court based its calculation on Mr. Martinez's testimony that he "hoped" to get profit sharing of 2 percent, despite the fact that the evidence

showed that he was never actually offered any profit sharing agreement. Even assuming that hope alone is sufficient, the court's math was off by a factor of 100.

The court relied on Tony Chee's email stating a ballpark of $500 million for the size of the *entire market for anti-ice systems*. That ballpark, assuming it was reliable (there was no evidence on that issue) was not an estimate of APAC's market share or APAC's projected profit margin. It was an estimate of the value of the entire market. Mr. Martinez never hoped to receive 2% of the entire market, just 2% of APAC's profits. There was no testimony or evidence about either (a) what portion of that total market APAC expected or intended to achieve in sales, or (b) what APAC's profit margin would have been. These analytical defects are fatal to determining the actual amount that would have gone to Mr. Martinez. However, assume *arguendo* that APAC intended to gain a 10% market share in a $500 million market and make a 10% profit off that 10% market share (both incredibly generous, optimistic projections). 2% profit sharing for Mr. Martinez would not be 2 percent of the total market ($500 million dollars), which

was the district court's calculation. Mr. Martinez's share would only be 2 percent of 10 percent (APAC's hypothetical profit) of 10 percent (APAC's hypothetical market share) of the entire $500 million market. So, to figure out that number, multiply $500 million by 0.1 (10% market share for APAC), then again by 0.1 (10% profit for APAC), then by 0.02 (Mr. Martinez's 2% of APAC profits). The resulting intended gain is $100,000. That is an 8-level adjustment—not a 20-level adjustment.

Thus, the 20-level upward adjustment, imposed on the basis of a determination of an "intended loss" and/or "intended gain" between $9.5 million and $25 million, was a misapplication of §2B1.1 because the evidence did not support that dollar figure by a preponderance of the evidence.

For the same reason, a non-Guidelines sentence imposed under § 3553(a) based on such an "intended loss" and/or "intended gain" finding would be substantively unreasonable, because it was insufficiently grounded in the evidence. While the Court stated that it would impose the same sentence "regardless of what the [G]uidelines said," [Doc 172-Pg 179] the same defect in the "loss" calculations would apply. If those

63

calculations are too speculative, too attenuated, and too remote from the trial evidence to support a Guidelines calculation, then they are equally too speculative, remote, and attenuated to support a sentence under reasonableness analysis. And absent that "loss" figure, there is no § 3553(a) justification for a 63-month prison sentence. As the Court acknowledged, all the other factors cut in Mr. Martinez's favor. [Doc 158-1, Doc 172-Pg 181-186: "I've taken the information that all these folks have given me about what a good person you are. So I've taken your history and your characteristics into consideration. I don't think you're going to violate the law again . . . I find that you're a really good person who did a terrible thing."] So leaving aside the "loss" calculation as substantively unreasonable, the question is: For a family man with no criminal history and a consistent, unbroken history of hard work and raising a family—a man who was an outside consultant with no ownership or control over APAC and who made just $4,500 for his involvement—is a five-year sentence for that man a reasonable one, when the charged crime was using old Gulfstream wind tunnel test plans as a template for a new plan? When it is undisputed that he was

64

hired to facilitate joint collaboration between APAC and Gulfstream, and the crime was continuing to use the Gulfstream documents after Gulfstream was no longer interest in the product? When there was no loss to Gulfstream?

## A.    Remand for Resentencing Is Required

This Court remands for resentencing when a district court misapplies the Guidelines, see, e.g., *United States v. Jews*, 74 F.4th 1325, 1327 (11th Cir. 2023) ("Because the district court miscalculated Jews's Guidelines range, we vacate his sentence and remand for resentencing"), and/or imposes a sentence that is substantively unreasonable, *United States v. Rogers*, 989 F.3d 1255, 1261 (11th Cir. 2021). A sentence is substantively unreasonable when it lies outside the range of reasonable sentences dictated by the facts of the case. [*Id.*] (citing *United States v. Irey*, 612 F.3d 1160, 1190 (11th Cir. 2010 (en banc)).

Because the district court should not have made "intended loss" and/or "intended gain" findings at all; and because both the "intended loss" and "intended gain" findings lacked a sufficient evidentiary basis,

65

were unduly speculative, and were based on unsupported, unreasonable, and incorrect assumptions, the sentence imposed was substantively unreasonable.

## CONCLUSION

For the foregoing reasons, Mr. Martinez respectfully requests that the Court vacate the judgment of the district court; and, depending on the Court's ruling, vacate his conviction and remand for a new trial; or remand for a new sentencing hearing.

Dated: July 10, 2024

Respectfully Submitted,

By:    /s/ Caleb E. Mason
       CALEB E. MASON
       Attorney for Defendant-Appellant
       JUAN MARTINEZ

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-column limitations of Fed. R. App. P. 32(a)(7)(B) as the brief contains 12,640 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because the brief has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook 14 point font.

Dated: July 10, 2024                Respectfully submitted,

                            By:    /s/ Caleb E Mason
                                   Caleb E. Mason
                                   Attorney for Defendant-Appellant
                                   JUAN MARTINEZ

**CERTIFICATE OF SERVICE**

I hereby certify that on July 10, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the CM/ECF portal system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Dated: July 10, 2024          Respectfully submitted,

By:    /s/ Caleb E Mason
       Caleb E. Mason
       Attorney for Defendant-Appellant
       JUAN MARTINEZ